IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| EPIC SYSTEMS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-00821-bbc |
| | ) | |
| YOURCAREUNIVERSE, INC., MEDHOST, | ) | |
| OF TENNESSEE, INC., AND MEDHOST | ) | |
| DIRECT, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

I.   INTRODUCTION ............................................................................................. 1

II.  Background ....................................................................................................... 1

III. Legal Standards ................................................................................................ 2

    A.  Summary Judgment ................................................................................... 2

    B.  Likelihood of Confusion ............................................................................ 3

IV.  Argument .......................................................................................................... 5

    A.  The evidence in this case demonstrates that no confusion is likely. ............ 5

        1.   *There is No Evidence of Actual Confusion.* .......................................... 5

        2.   *The **CARE EVERYWHERE** and **YOURCAREEVERYWHERE** Products Are Entirely Different.* ........................................................ 7

        3.   *Epic's CARE EVERYWHERE Mark is Weak and the "Strength" Factor Favors the Defendants.* ...................................................... 12

            a.   Epic's mark describes or suggests its products. ................................ 13

            b.   Epic's mark is also weak because it is used inconsistently by Epic and its customers. ................................................................................ 15

            c.   Significant third-party use of the elements of Epic's mark demonstrate the weakness of the mark. ............................................................. 16

            d.   The Defendants' own YOURCAREEVERYWHERE mark is not particularly strong. .......................................................................... 17

        4.   *The Defendants Did Not Palm Off Their Consumer-Facing Website as the Care Everywhere Interoperability Tool.* ........................................ 19

        5.   *The Marks Are Used in Different Areas and Manners.* ............................ 23

        6.   *As Used, the YOURCAREEVERYWHERE and CARE EVERYWHERE Marks Are Dissimilar.* ............................................... 28

        7.   *Consumers Who Know of Care Everywhere Are Knowledgeable and Likely to Exercise Significant Care.* ............................................... 30

    B.  Epic Has Failed to Establish that this Case Is "Exceptional." ...................... 34

V.   CONCLUSION ................................................................................................ 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AHP Subsidiary Holding Co. v. Stuart Hale Co.*,
    1 F.3d 611 (7th Cir. 1993) ................................................................4

*AM Gen. Corp. v. DaimlerChrysler Corp.*,
    311 F.3d 796 (7th Cir. 2002) ...............................................19, 22, 33

*Barbecue Marx, Inc. v. 551 Odgen, Inc.*,
    235 F.3d 1041 (7th Cir. 2000) ........................................................7, 11

*Bobak Sausage Co. v. A & J Seven Bridges, Inc.*,
    805 F. Supp. 2d 503 (N.D. Ill. 2011) ..........................................7, 9, 12

*Box Acquisitions, LLC v. Box Packaging Prods., LLC*,
    32 F. Supp. 3d 927 (N.D. Ill. 2014) ...............................................30

*Brainstorm Interactive, Inv. v. School Specialty, Inc.*,
    2014 WL 6893881 (W.D. Wis. 2014)................................................34

*Breuer Elec. Mfg. Co. v. Hoover Co.*,
    1998 WL 427595 (N.D. Ill. July 23, 1998)....................................30

*Burford v. Accounting Practice Sales, Inc.*,
    786 F.3d 582 (7th Cir. 2015) ......................................................34, 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).........................................................................2

*Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*,
    554 F.3d 1133 (7th Cir. 2009) ........................................................3

*Eli Lilly & Co. v. Nat. Answers, Inc.*,
    233 F.3d 456 (7th Cir. 2000) ........................................................12

*Ellington v. Gibson Piano Ventures, Inc.*,
    2005 WL 1661729 (S.D. Ind. June 24, 2005)................................22

*Fortes Grand Corp. v. Warner Bros. Entm't Inc.*,
    763 F.3d 696 (7th Cir. 2014) ........................................................3, 4

*Gimix, Inc. v. JS & A Grp., Inc.*,
    699 F.2d 901 (7th Cir. 1983) .............................................13, 14, 15

*Henri's Food Products Co., Inc. v. Kraft, Inc.*,
   717 F.2d 352 (7th Cir. 1983) ........................................................................20, 28

*Knaack Mfg. Co. v. Rally Accessories, Inc.*,
   955 F. Supp. 991 (N.D. Ill. 1997) ...............................................................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...................................................................................2

*Maxim's Ltd. v. Badonsky*,
   772 F.2d 388 (7th Cir. 1985) ......................................................................30

*Munters Corp. v. Matsui Am., Inc.*,
   909 F.2d 250 (7th Cir. 1990) ......................................................................12

*Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*,
   692 F.2d 478 (7th Cir. 1982) ................................................................13, 14

*Nichols v. Nat'l Union Fire Ins. Co.*,
   509 F. Supp. 2d 752 (W.D. Wis. 2007) ........................................................3

*Nightingale Home Healthcare, Inc. v. Andoyne Therapy, LLC*,
   626 F.3d 958 (7th Cir. 2010) ..........................................................13, 33, 34

*Nike, Inc. v. Just Did It Enters.*,
   6 F.3d 1225 (7th Cir. 1993) ......................................................................6, 35

*Oreck Corp. v. U.S. Floor Sys., Inc.*,
   803 F.2d 166 (5th Cir. 1986) ......................................................................12

*Packman v. Chicago Tribune Co.*,
   267 F.3d 628 (7th Cir. 2001) ...........................................................*passim*

*Patterson v. TNA Entm't, LLC*,
   No. 04-C-0192, 2006 WL 3091136 (E.D. Wis. Oct. 27, 2006)...........................3

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
   80 F. Supp. 2d 815 (N.D. Ill. 1999) .........................................................5, 6

*Quaker Oats Co. v. Gen. Mills*,
   134 F.2d 429 (7th Cir. 1943) ......................................................................4

*Rust Env't & Infrastructure, Inc. v. Teunissen*,
   131 F.3d 1210 (7th Cir. 1997) ..........................................................11, 30, 32

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
   978 F.2d 947 (7th Cir. 1992) ..........................................................13, 22, 34

iii

*Smith Fiberglass Prods., Inc. v. Ameron, Inc.*,
    7 F.3d 1327 (7th Cir. 1993) ...............................................................23, 26

*Sorensen v. WD-40 Co.*,
    792 F.3d 712 (7th Cir. 2015) ....................................................... *passim*

*Specht v. Google, Inc.*,
    805 F. Supp. 2d 551 (N.D. Ill. 2011) ...............................................35

*Sullivan v. CBS Corp.*,
    385 F.3d 772 (7th Cir. 2004) ...............................................................17, 28

*Telemed Corp. v. Tel-Med, Inc.*,
    588 F.2d 213 (7th Cir. 1978) ...............................................................12, 13, 16

*Top Tobacco, L.P. v. N. Am. Atl. Operating, Co.*,
    509 F.3d 380 (7th Cir. 2007) ...............................................................10

*Union Carbide Corp. v. Ever-Ready Incorporated*,
    531 F.2d 366 (7th Cir. 1976) ...............................................................12

*Winsley v. Cook County*,
    563 F.3d 598 (7th Cir. 2009) ...............................................................3

**Statutes**

15 U.S.C. § 1114 ...............................................................3, 33

15 U.S.C. § 1117(a) ...............................................................33, 36

15 U.S.C. § 1125 ...............................................................3

**Other Authorities**

Fed. R. Civ. P. 56(a) ...............................................................2

2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair
    Competition § 11.85 (4th ed. 2015) ...............................................................16

I.     **INTRODUCTION**

This case concerns Plaintiff Epic Systems Corporation's ("Epic") claims that Defendants' YOURCAREEVERYWHERE mark is likely to cause confusion with Epic's CARE EVERYWHERE mark within the healthcare marketplace.  Simply put, there is no likelihood of confusion between the parties' marks. Other than the facial similarity in each mark's use of the words "care" and "everywhere," there are ***no*** factors relevant to the likelihood of confusion analysis that support Epic's claims.

Despite almost two years of concurrent use of the parties' marks, there is no evidence of even a single instance of actual confusion. That there is no actual confusion is likely a result of the lack of any similarity in Epic's CARE EVERYWHERE software and Defendants' YOURCAREEVERYWHERE services. And, because there is no similarity between the products, there is also little, if any, similarity in the area and manner of concurrent use of the marks. Furthermore, Epic's customers—healthcare executives and providers—are the quintessential sophisticated consumers who are likely to exercise a high degree of care in the evaluation and purchase of Epic's undeniably expensive electronic health record ("EHR") software, of which the CARE EVERYWHERE software is one component. Finally, Epic's mark is weak and there is simply no evidence of any intent of the Defendants to "palm off" their services as those of Epic.

Because there is no likelihood of confusion between the parties' marks, the Defendants are entitled to an award of summary judgment in their favor on all of Epic's claims.

II.    **BACKGROUND**

The facts necessary to support Defendants' motion for summary judgment are fully set forth in their Proposed Findings of Fact and will not be repeated in full here. In summary, the Plaintiff, a vendor of electronic health record software to large hospital systems, uses the mark

1

CARE EVERYWHERE for the portion of its EHR software package that transfers patient records from healthcare facility to facility. Defendant MEDHOST of Tennessee, Inc. ("MEDHOST TN") is also a vendor of EHR software, but does not compete head-to-head with Epic in the EHR marketplace. Unlike Epic, MEDHOST's clients are small and midsize community hospitals.

Defendant YourCareUniverse, Inc. ("YCU"), like MEDHOST TN a subsidiary of MEDHOST, Inc., operates a public-facing website yourcareeverywhere.com (similar to WebMD) and uses the mark YOURCAREEVERYWHERE in connection with its website and consumer health and wellness patient engagement solution. The Plaintiff contends that the Defendants' use of YOURCAREEVERYWHERE is likely to cause confusion with its CARE EVERYWHERE mark. Defendants disagree, and so did the U.S. Trademark Office.

The USPTO allowed the defendants' application to register YOURCAREEVERYWHERE over Epic's trademark registration for CARE EVERYWHERE. Epic opposed the defendants' mark when the application was published, and this dispute ensued. The Trademark Office was correct—there is no likelihood of confusion between the parties' marks or services at issue. For the reasons set forth herein, Defendants are entitled to summary judgment in their favor on all of Plaintiff's claims.

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Under the familiar standard for summary judgment, the Court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive this motion, Epic would have to present evidence that a genuine fact issue compels a trial. *Celotex*, 477 U.S. at 324. Epic must offer admissible

evidence that establishes a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Although the Court must "constru[e] all facts and reasonable inferences in the nonmoving party's favor," *Winsley v. Cook County*, 563 F.3d 598, 602 (7th Cir. 2009), Epic must come forth with enough evidence to support a reasonable jury verdict in its favor. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

As this Court has often explained, summary judgment is not a dress rehearsal for trial. It is put-up-or shut-up time at which Epic must show that it has enough evidence to warrant a trial. *Nichols v. Nat'l Union Fire Ins. Co.*, 509 F. Supp. 2d 752, 760 (W.D. Wis. 2007) (citation omitted).These principles equally apply in a trademark infringement case, even where issues such as "the finding that consumers are not likely to be confused about the origin of a defendant's products are [ordinarily] questions of fact." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001). If the evidence is "so one-sided," as it is here, "that there can be no doubt about how the question should be answered," even fact issues like these can and should be resolved on summary judgment. *Id.* (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996)). In this case, there is no doubt that consumers are not likely to be confused about the origin of Defendants' YOURCAREEVERYWHERE (also referred to as "YCE") services. Summary judgment should be granted in Defendants' favor on all of Epic's claims.

### B.   Likelihood of Confusion

To establish a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114; common law unfair competition, *id.* § 1125; or trademark infringement under Wisconsin law, the plaintiff must prove likelihood of confusion. *Fortes Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *Patterson v. TNA Entm't, LLC*, No. 04-C-0192,

2006 WL 3091136, at *21 (E.D. Wis. Oct. 27, 2006) ("The factors of analysis for likelihood of confusion under a Wisconsin statutory trademark claim are identical to those applied in a federal Lanham Act case.").

In the Seventh Circuit, courts consider the following seven factors to determine the likelihood of confusion:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.

*Packman*, 267 F.3d at 643. The importance of the various factors will "depend[] on the facts presented," and "[n]o single factor is dispositive." *Id.* Ordinarily, the most important factors are "the similarity of the marks, the defendant's intent, and actual confusion." *Id.* (citing *Barbecue Marx, Inc. v. 551 Odgen, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000)).

"Likelihood of confusion" refers not to "general confusion 'in the air'" but "[r]ather[] only [to] confusion about 'origin, sponsorship, or approval of . . . goods." *Fortes Grand*, 763 F.3d at 701 (quoting 15 U.S.C. § 1125). As the Seventh Circuit has explained, the focus on the perspective of relevant consumers and what occurs in the marketplace is crucial. *See Quaker Oats Co. v. Gen. Mills*, 134 F.2d 429, 433 (7th Cir. 1943). Where there is no doubt in the marketplace as to the source or nature of a product, "there [is] no confusion." *Id.*

To prevail on summary judgment, a defendant is not required to "refute each and every factor." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989). Instead, a defendant is entitled to summary judgment if the "weight and totality of the most important factors in [the] case" are "determinative of [no] likelihood of confusion." *Id.* (quoting *Schwinn*, 870 F.2d at 1187); *see id.* (holding that district court did not commit legal error in

4

granting summary judgment where three factors weighed in favor of likelihood of confusion). No reasonable juror considering the evidence in this case would find for Epic on the issue of likelihood of confusion. Thus, the Court should grant summary judgment to the Defendants.

## IV.   ARGUMENT

### A.   The evidence in this case demonstrates that no confusion is likely.

The Defendants are entitled to summary judgment in their favor on all of Epic's claims because there is no genuine dispute of material fact as to the issue of whether the YOURCAREEVERYWHERE mark is likely to cause confusion with Epic's CARE EVERYWHERE mark among relevant consumers. The well-known likelihood of confusion factors provide the framework for this analysis (*see Packman*, 276 F.3d at 643), and the evidence concerning each factor is discussed below.

#### 1.   *There is No Evidence of Actual Confusion.*

Epic has no evidence of actual confusion. Defendants' Proposed Findings of Fact in Support of Motion for Summary Judgment ("DFF") 211, 216. Evidence of actual confusion can be either direct consumer evidence or survey evidence. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 884 (N.D. Ill. 1999). Despite ample opportunity to adduce this evidence, Epic produced none and has stipulated that it has no evidence of actual confusion. DFF 211, 216. These facts strongly suggest that there is no likelihood of confusion in this case.

It is powerful evidence that not a single consumer, whether an individual patient or healthcare provider, has expressed confusion. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ therefore, it is

conceivable, if not likely, that at least some of the account holders and others who have visited

the yourcareeverywhere.com site have also used or otherwise been exposed to Epic's CARE

EVERYWHERE software. Nonetheless, not one patient or provider has complained of or

suggested confusion due to the Defendants' YOURCAREEVERYWHERE mark—a fact that

Epic has conceded. DFF 211, 216.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ *see Planet Hollywood*, 80 F. Supp. 2d at

883 (finding that the significance of the absence of evidence of actual confusion was heightened

because the parties had actively been litigating for several years and the plaintiff had ample

incentive to uncover evidence of actual confusion).

The lack of actual confusion weighs heavily against a finding of a likelihood of

confusion. The Seventh Circuit has recognized that "it is certainly proper for the trial judge to

infer from the absence of actual confusion that there was also no likelihood of confusion." *Nike,*

---

[1] ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

*Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1231 (7th Cir. 1993) (internal quotation marks and citation omitted), and the Court should do so here.

### 2. *The CARE EVERYWHERE and YOURCAREEVERYWHERE Products Are Entirely Different.*

The dissimilarity of Epic's CARE EVERYWHERE product and Defendants' YOURCAREEVERYWHERE services also weighs strongly against a finding of likelihood of confusion. Important differences in the products—including, among other things, product purpose (*compare* DFF 27 to DFF 151), target market (*compare* DFF 16 to DFF 151), and price point (*compare* DFF 87 to DFF 160)—establish significant dissimilarities. When considering this factor, courts consider not only the similarities (or dissimilarities) between the products but also similarities in how those products "appear in the marketplace," including "ambience, theme and style." *Packman*, 267 F.3d at 645–46 (discussing *Barbeque Marx*, 235 F.3d at 1045). For instance, even when parties produce the same general product (i.e. t-shirts and hats), there is no likelihood of confusion when each "offer[s] their products in a distinctive style and manner, minimizing the likelihood of confusion." *Id.* at 645. Where differences in the products lead customers in some situations to purchase the defendant's product and in other situations the plaintiff's product, confusion is especially unlikely. *See Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 516 (N.D. Ill. 2011) (ruling that likelihood of confusion was unlikely where "a couple celebrating their wedding or a company staging its quarterly sales conference would likely choose the [the defendant's services]" whereas "a family interested in catering a tailgate or other informal event would likely choose [the plaintiff's services]").

The CARE EVERYWHERE software and the YOURCAREEVERYWHERE services are fundamentally different. Epic's CARE EVERYWHERE product is interoperability software available only to customers of the EpicCare EHR system. DFF 26, 27, 30, 31, 32, 87. In contrast,

Defendants' YOURCAREEVERYWHERE mark is primarily used for a publicly available health and wellness content website. DFF 151. Defendant YCU also offers marketing consultation services and the opportunity to co-brand the yourcareeverywhere.com website to healthcare providers as part of the YOURCAREEVERYWHERE services. DFF 153. Epic does not have a health and wellness website similar to yourcareeverywhere.com (DFF 49), and *Epic does not consider any product offered by the Defendants as competing with CARE EVERYWHERE.* DFF 185.

Furthermore, according to Epic's federal trademark registration, the CARE EVERYWHERE mark is used on software that allows the exchange of information across different information systems:

> Computer software for use in the healthcare field, namely software for entering, storing, editing, organizing, integrating, synchronizing, processing, accessing, managing, communicating and sharing data *to, from, across and among multiple separate information systems*, including heterogeneous systems, and user manuals and documentation packaged with such computer software.

DFF 21. (emphasis added). By contrast, YCU's services associated with YOURCAREEVERYWHERE are providing information and educational resources to consumers via the web:

> Providing non-downloadable computer software through a web based portal *for consumers to access medical, healthcare and health enhancement information and educational resources*, including electronic publications, information on chronic diseases, health news, articles about health and wellness, medical reference material, consumer-driven query capability for symptom checkup, pharmacy information, medical news, and interactive tools for helping patients manage their health.

DFF 200. (emphasis added). Additionally, the parties' marks are classified in different International Trademark classes. Epic's CARE EVERYWHERE software is in Class 9 (DFF 21); the Defendants' YOURCAREEVERYWHERE services are in Class 42. DFF 198.

Plainly, the CARE EVERYWHERE and YOURCAREEVERYWHERE products and services take different forms, have entirely different purposes, address very different problems and are marketed to entirely different sets of primary users. CARE EVERYWHERE was created to address the problem that, without an interoperability tool, different EHR systems cannot communicate with one another or share data. DFF 19, 27. CARE EVERYWHERE thus provides an interoperability platform that allows a patient's records to follow her everywhere she goes to receive medical care. DFF 26, 27, 28, 29. YOURCAREEVERYWHERE, on the other hand, was developed to address the public's need for general (i.e., not specific to a particular patient's care) health and wellness information as well as the desire of healthcare providers to engage with their patients and potential patient population. DFF 151, 153. The YOURCAREEVERYWHERE services provide general health and wellness content and a mobile application that can be accessed by any member of the public and that can be co-branded by a healthcare facility wishing to better engage with patients. DFF 151, 153.

Given the vast differences in the CARE EVERYWHERE product and YOURCAREEVERYWHERE services, they "appear in the marketplace" in very dissimilar ways. *Packman*, 267 F.3d at 645–46. CARE EVERYWHERE is simply a component of Epic's EHR system (DFF 30-32); whereas, YOURCAREEVERYWHERE is primarily a publicly available website, accessible to all consumers regardless of their affiliation with a specific facility. DFF 151, 152, 154. This publicly available website prominently uses the YOURCAREEVERYWHERE mark (DFF 144), and the site has its own "ambience, theme and style." *Id*. Simply put, the products do not just appear differently in the marketplace; they are directed to different markets altogether.

9

The differences in these products underscores that consumers would evaluate and choose Epic's CARE EVERYWHERE or YCU's YOURCAREEVERYWHERE products and services for entirely different reasons. *See Bobak Sausage*, 805 F. Supp. 2d at 516. On the one hand, the CARE EVERYWHERE consumer is a healthcare facility interested in having a robust EHR product with the CARE EVERYWHERE software's ability to exchange patient medical records with other systems. DFF 27, 30.

On the other hand, the YOURCAREEVERYWHERE consumer is primarily the general public who may be looking for health and wellness information, and healthcare facilities interested in services improving patient engagement efforts and interacting with general consumers within a potential patient population. DFF 153. Any member of the public might choose to receive health and wellness information from YOURCAREEVERYWHERE, instead of another source such as WebMD. DFF 151. "It is next to impossible to believe that any consumer, however careless, would confuse these products." *Top Tobacco, L.P. v. N. Am. Atl. Operating, Co.*, 509 F.3d 380, 383 (7th Cir. 2007).

Although the primary use of the YOURCAREEVERYWHERE mark is in connection with a freely available health and wellness website (DFF 151), YCU also licenses a co-branded "landing page" on the yourecareeverywhere.com site to healthcare providers and offers marketing consultation services to providers under the YOURCAREEVERYWHERE mark. DFF 153. The YOURCAREEVERYWHERE services are components of the YCU family of "YOURCARE" products and services offered to healthcare providers to assist in managing the business of healthcare. DFF 122, 123, 114, 142. Unlike Epic's CARE EVERYWHERE software, which is a component of the EpicCare EHR system, the YOURCAREEVERYWHERE services are not a component of the MEDHOST Enterprise EHR software system. DFF 143, 162.



Because the CARE EVERYWHERE software and YOURCAREEVERYWHERE services are so dissimilar, confusion is not likely even though Epic and MEDHOST both sell EHR systems, albeit to different segments of the healthcare market. *See, e.g.,* DFF 16, 17, 164, 70-79. To the extent Epic and MEDHOST's EHR products are similar, that similarity is largely due to government regulations that dictate many of the features that an EHR system must contain and apply equally to every EHR vendor. DFF 173, 174. The parties' suite of products thus do not have a similar "appear[ance] in the marketplace" because they are offered "in a distinctive style and manner." *Packman*, 267 F.3d at 645–46 (discussing *Barbeque Marx*, 235 F.3d at 1045).



11

For all of these reasons, no reasonable consumer would be confused between YOURCAREEVERYWHERE's health and wellness content website and CARE EVERYWHERE's interoperability EHR software. *See, e.g.*, *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997) (quoting *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 414 (7th Cir. 1994)) (explaining that trademark law does not "protect the most gullible fringe of the consuming public"). Accordingly, the CARE EVERYWHERE software and YOURCAREEVERYWHERE services are dissimilar, particularly as they are perceived by relevant consumers. This factor weighs strongly against a likelihood of confusion.

### 3. Epic's CARE EVERYWHERE Mark is Weak and the "Strength" Factor Favors the Defendants.

Epic's CARE EVERYWHERE mark is weak and is entitled only to a very narrow scope of protection, at best. This fact weighs strongly against any likelihood of confusion. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (internal quotation marks, alteration, and citation omitted). Even if a mark has attained incontestable status, the district court must analyze the strength of the mark to evaluate the likelihood of confusion. *See Munters Corp. v. Matsui Am., Inc.*, 909 F.2d 250, 252 (7th Cir. 1990); *see also Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 171 (5th Cir. 1986) ("[I]ncontestable status does not make a weak mark strong."). In other words, "[i]ncontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim." *Union Carbide Corp. v. Ever-Ready Incorporated*, 531 F.2d 366, 377 (7th Cir. 1976). "[S]trength cannot be proven merely by conclusory statements from a party's executive

that its mark is well-known." *Bobak Sausage*, 805 F. Supp. 2d at 519; *see also Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978) ("If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly marketed. Only the strong mark will be protected against infringements arising out of its use in connection with noncompeting goods.") (internal quotation marks and citation omitted).

a.   Epic's mark describes or suggests its products.

A mark is descriptive when it "is merely descriptive of the ingredients, qualities, or characteristics" of the goods or services. *Gimix, Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 906 (7th Cir. 1983) (internal quotation marks and citation omitted). To be descriptive, a mark need not "depict the product itself, but only . . . refer to a *characteristic* of the product." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 952 (7th Cir. 1992) (internal quotation marks, alterations, and citation omitted). Where "components of a trade name are common descriptive terms, a combination of such terms retains that quality." *Nat'l Conference of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir. 1982); *see also Telemed*, 588 F.2d at 217 ("Combining two descriptive words to form one new word does not automatically render the new term fanciful.").

In this case, both components of Epic's Mark—CARE and EVERYWHERE—are descriptive of Epic's interoperability software on which the Mark is used. Epic describes its Care Everywhere product as an interoperability platform that facilitates the transfer of patient records, including medical records, from one location to another. DFF 26, 27. The purpose of this software is to allow patients to have their medical records follow them anywhere and *everywhere* they go to receive health*care*. DFF 28, 29. In fact, the name "CARE EVERYWHERE" was specifically chosen to evoke "something to both patients and providers, which is anywhere you

13

get your care, there can be [a] composite record of all of that care in one place.  So anywhere you go, we can pull information from Care Everywhere." DFF 29.

The word "care," which forms part of the word "healthcare," clearly describes an aspect of Epic's interoperability platform because the very purpose of the product is to transfer information regarding patients' medical condition to other healthcare providers for their use in rendering care. DFF 27. The word "everywhere" also describes this software. "Everywhere" invokes the software's ability to transfer records outside the walls of a healthcare provider's organization to other providers—in other words, "everywhere"—which describes both the functionality and the purpose of CARE EVERYWHERE. DFF 27, 28, 29.

These descriptive terms remain weak when combined into the composite CARE EVERYWHERE mark because they are "common terms" in the healthcare industry[3] and, combined, they still describe Plaintiff's software offered under the mark. *Nat'l Conference*, 692 F.2d at 488. For obvious reasons, the word "care" is frequently used in connection with products offered in the healthcare industry. DFF 165. Likewise, the word "everywhere" is also commonly used. DFF 166. The ability to operate with systems at other organizations is viewed not only as a selling point in healthcare but also a necessity due to recent government mandates. DFF 173-177. So, the word "everywhere" is used to indicate that Epic's interoperability product provides that capability. DFF 166. Thus, the combination of these two descriptive terms retains their individual descriptive characters in the composite mark. *Nat'l Conference*, 692 F.2d at 488.

---

[3] For example, Care Everywhere, LLC registered the domain name www.CareEverywhere.com in April 2004 and remains the owner of that domain today. DFF 168, 170. Thus, a patient, or any other person, accessing www.careeverywhere.com would be provided information concerning Care Everywhere, LLC's healthcare software and products that share medical data, not Epic's. DFF 171.

b.      Epic's mark is also weak because it is used inconsistently by Epic and its customers.

Inconsistent use of mark, like that shown by Epic and its customers, is one of the "[m]ost damaging" forms of evidence for the strength of a mark, because it "makes a [mark] less helpful to consumers as a source indicator, and therefore a weaker mark." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 731 (7th Cir. 2015); *Gimix*, 699 F.2d at 907 ("[F]ar from creating an issue of fact as to a massive advertising campaign to establish 'Auto Page' in the minds of the public as its exclusive mark, Gimix has failed to counter the impression that it in fact used the term inconsistently.").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. These facts illustrate that to

the extent patients are aware of the CARE EVERYWHERE mark, it often appears to the patients

that the Epic customer—not Epic—is the source of the CARE EVERYWHERE software. DFF

101-110. Inconsistent use of the CARE EVERYWHERE mark by Epic and its customers is

strong evidence of the weakness of Epic's mark. *See Sorensen*, 792 F.3d at 731; *Gimix*, 699 F.2d

at 907.

c.   Significant third-party use of the elements of Epic's mark
      demonstrate the weakness of the mark.

Extensive third party trademark registrations and use of the terms in Epic's mark in the

healthcare industry demonstrates that no one party is entitled to broad rights in their mark. *See*

*Telemed*, 588 F.2d at 218 (explaining that numerous other uses by third parties is persuasive

evidence of descriptiveness); *Knaack Mfg. Co. v. Rally Accessories, Inc.*, 955 F. Supp. 991,

1002–03 (N.D. Ill. 1997) ("[T]he extensive use of the marks incorporating" "the fusion of two

common words" "by third-parties on a wide variety of goods, services, and businesses clearly

demonstrate the lack of distinctiveness and strength in [a] mark."); 2 J. THOMAS MCCARTHY,

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11.85 (4th ed. 2015) (explaining that

when a mark is "merely one of a crowd of similar marks[,] . . . customers will not likely be

confused between any two of the crowd and may have learned to carefully pick out one from the

other"). In addition to the common usage of the individual words "care" and "everywhere"

within the healthcare industry, the Defendants have identified several instances in which the

words "CARE EVERYWHERE" are used in registered and applied-for marks for goods or services similar or related to Epic's product:

- EXPERT CARE EVERYWHERE, Reg. No. 2606638.

- EVERYWHERECARE, Reg. No. 3169541.

- HEALTHCARE EVERYWHERE, Ser. No. 86/902,476 is an application for which the trademark examining attorney found no conflicting marks that would bar registration. The applicant is simply required to disclaim the exclusive right to use "HEALTHCARE" apart from the mark.

- CARE. VIRTUALLY EVERYWHERE, Ser. No. 85/904,198 is an allowed application. Once a statement of use is filed, it will register.

DFF 167. Based on these other registrations and applications of marks containing the words "CARE EVERYWHERE" in the healthcare industry, in addition to the Trademark Office's allowance of Defendants' YOURCAREEVERYWHERE mark, Epic's CARE EVERYWHERE mark is weak. *See Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) (citing *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)) (holding that even if a component of a mark is arbitrary as applied to the goods or services, the mark may still be weak because of the common use of that word in similar marks). That the Trademark Office has concluded that HEALTHCARE EVERYWHERE, EVERYWHERECARE, EXPERT CARE EVERYWHERE, CARE. VIRTUALLY EVERYWHERE, and CARE EVERYWHERE can all coexist provides a strong indication that Epic's mark is weak and entitled to only very narrow protection. There is no reason that the Defendants' YOURCAREEVERYWHERE mark, for different products and services, cannot also coexist with Epic's CARE EVERYWHERE mark.

      d.     <u>The Defendants' own YOURCAREEVERYWHERE mark is not particularly strong.</u>

Defendants' own mark is also not so strong that the parties cannot peaceably coexist. The USPTO did not find any likelihood of confusion between the parties' marks; rather, the USPTO

*allowed* YCU's application for YOURCAREEVERYWHERE over Epic's CARE

EVERYWHERE mark.  DFF 199.  Additionally, the USPTO found that other members of

Defendants' family of YOURCARE marks are descriptive. For example, the USPTO rejected on

descriptiveness grounds YCU's application for the mark YOURCARE for the services:

> providing temporary use of on-line non-downloadable cloud computing software
> for use in the healthcare field, namely, software for managing, storing, analyzing,
> maintaining, processing, structuring, reviewing, building, editing, distributing,
> communicating, organizing, sharing, referencing, monitoring and integrating
> healthcare information for healthcare providers, patients, and customers.

DFF 220. YCU appealed the rejection by the trademark examining attorney, and the TTAB

affirmed. DFF 220. The TTAB found persuasive the examining attorney's submission of a

dictionary definition of the word "care" as "the provision of what is necessary for the health,

welfare, maintenance, and protection of someone or something … health care." DFF 221. The

TTAB further cited the examining attorney's submission of "fourteen registrations for marks

containing the word CARE in which CARE is disclaimed," e.g.:

> Reg. No. 4002633 - CARE ELSEWHERE[4]
> Services: Computer software for use in medical and healthcare fields, namely,
> computer software for managing, acquiring, storing, analyzing, maintaining,
> processing, structuring, reviewing, building, editing, distributing, communicating,
> organizing, sharing, referencing, monitoring and integrating information, and
> accompanying manuals sold as a unit; computer software for automating clinical and
> administrative healthcare processes;
>
> Reg. No. 3693510 - CARE VISIBILITY
> Services: Computer software for managing workflow, resource utilization, and
> patient care in a health care setting;
>
> Reg. No. 3611361-ANTHEM CARE COMPARISON
> Services: Providing an online tool, namely, providing temporary use of non-
> downloadable software that provides consumers with information about costs for
> various medical procedures;
>
> Reg. No. 3686032 - CARE OPPORTUNITIES
> Services: Application service provider, namely, providing, hosting, managing,
> developing, and maintaining a webbased application, web sites and databases that

---

[4] This is Plaintiff's mark and registration.

link medical information with medical claims data and the applicable standards of care, to provide clinical decision support for chronic medical conditions electronically; providing electronic clinical decision support, namely, providing a website featuring on-line non-downloadable software tools for making medical care decisions based on medical information, medical claims data, and standards of care, designed to assist health professionals with decision making tasks; and

Reg. No. 4240990 - EZ CARE
Services: Computer software for management, disease management, management in healthcare industry.

DFF 222. The TTAB commented, "[t]hese registrations reflect that the word 'CARE' is considered descriptive by the USPTO when used in connection with software for healthcare related services." DFF 222. The YOURCARE trademark was ultimately registered on the Supplemental Register of trademarks. DFF 223. Similarly, YCU's applications for the trademarks YOURCAREDATA, YOURCAREREFERRAL, YOURCAREANALYTICS, and YOURCARETRANSFER were refused registration on the Principal Register on descriptiveness grounds, and are now also registered on the Supplemental Register. DFF 224.

These examples show that at least one of the terms at issue in this case, "CARE," is a common term in the healthcare field. No one party has broad rights, and the parties can and are peaceably coexisting.

### 4. The Defendants Did Not Palm Off Their Consumer-Facing Website as the Care Everywhere Interoperability Tool.

The Defendants' intent in adopting the YOURCAREEVERYWHERE mark also weighs heavily against finding a likelihood of confusion. There is simply no evidence that YCU, when adopting its YOURCAREEVERYWHERE mark, was "attempting to 'pass off' [its] products as having come from [Epic]." *Packman*, 267 F.3d at 644 (citation omitted). "Passing off means fraud; it means trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 829 (7th Cir. 2002) (internal quotation marks and

citation omitted). No evidence in the record suggests that the Defendants were trying to represent themselves as selling Epic products. Instead, the undisputed evidence establishes that the Defendants adopted and used the mark with the "intent to promote itself as the source" of its goods and services. *Id.*; *see also* DFF 122, 123, 128, 131, 142.

The Defendants adopted the YOURCAREEVERYWHERE mark for bona fide reasons after doing their due diligence. DFF 135. The Defendants intended to brand an entire line of products using the "YOURCARE" nomenclature. DFF 122, 123, 181, 142. After the decision to adopt the YOURCAREEVERYWHERE mark, the Defendants continued to build their family of YOURCARE marks. DFF 142. In addition to the YOURCAREEVERYWHERE mark, that family currently includes, or has at one time included, the following marks:

- YOURCAREANALYTICS
- YOURCARELINK
- YOURCAREREFERRAL
- YOURCARETRANSFER
- YOURCAREHEALTH
- YOURCAREPROVIDER
- YOURCARESUCCESS
- YOURCAREDATA
- YOURCAREEXCHANGE
- YOURCAREINTERACT
- YOURCARENAVIGATION
- YOURCAREWELLNESS
- YOURCARECOMMUNITY
- YOURCAREKNOWLEDGE
- YOURCAREMESSENGER
- YOURCAREVISUALIZE

DFF 142. Thus, YOURCAREEVERYWHERE is simply one member of a growing family of "YOURCARE" marks. DFF 142. Importantly, the dominant portion of the entire family of marks is "YOURCARE," and "YOURCARE" is also the dominant portion of YOURCAREEVERYWHERE. According to this Circuit, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983) The term YOURCARE is dissimilar to CARE in sound, meaning, and commercial connotation, further differentiating the parties' respective marks.

The only reasonable inference to be drawn is that the Defendants intended to identify YCU as the source of a family of YOURCARE marks, not that the Defendants intended to palm off their products as coming from, sponsored by, or affiliated with Epic or as related to Epic's CARE EVERYWHERE interoperability software. If Defendants had intended to palm off Epic's CARE EVERYWHERE mark, or otherwise trade off of the goodwill associated with Epic's mark, one would expect that the Defendants would not have had to engage in a multimillion dollar advertising campaign to raise awareness of their YOURCARE brand, which they did. DFF 130.

The Defendants' general knowledge of Epic and its mark at the time they adopted the YOURCAREEVERYWHERE mark cannot create a genuine issue of material fact on this issue because "[m]ere knowledge of someone else's mark is insufficient to show intent to pass off." *Sorenson*, 792 F.3d at 731. When presented with Epic's CARE EVERYWHERE mark, Defendants considered the intended services associated with their YOURCAREEVERYWHERE mark—namely, a consumer-oriented health and wellness website—and reached the reasonable conclusion that the services associated with the YOURCAREEVERYWHERE mark were

markedly different from Epic's interoperability software for exchanging medical records. DFF 135. The Defendants reached this conclusion based on both Epic's own description of its CARE EVERYWHERE software and based on the Defendants' general knowledge of Epic and CARE EVERYWHERE. DFF 135.

Even the Examiner of the YOURCAREEVERYWHERE trademark application at the U.S. Patent and Trademark Office reached the same conclusion when he found that the YOURCAREEVERYWHERE mark was allowable. DFF 199. Thus, the Defendants' mere knowledge of Epic's mark, on its own, cannot establish fraudulent intent. *Packman*, 267 F.3d at 644 (explaining that "aware[ness] . . . of [plaintiff]'s mark" cannot show fraudulent intent where "the phrase has been widely used" and "the appearance of the phrase . . . is visually distinct").

The Defendants' decision to continue using YOURCAREEVERYWHERE after Epic objected also cannot establish intent to palm off. "Even the defendant's refusal to cease using the mark upon demand is not necessarily indicative of bad faith." *Sands, Taylor*, 978 F.2d at 962 (internal quotation marks and citation omitted); *see also AM Gen.*, 311 F.3d at 829 ("The intent to compete is not the intent to pass off the product as the competitor's."). By the time that Epic contacted the Defendants, the Defendants had already investigated the mark, their "research had revealed that there was no product about which people were likely to be confused," and they had invested substantially in bringing the YOURCAREEVERYWHERE services to market. *Id.*; DFF 135, 201, 129, 130, 126. Around the time that Epic contacted the Defendants, an independent third party—the trademark examiner—reached a similar conclusion. DFF 199. Where, as here, there is no evidence that "the defendant intended there to be confusion," "this factor tilts in favor of [the] Defendants." *Ellington v. Gibson Piano Ventures, Inc.*, 2005 WL 1661729, at *6, 8 (S.D. Ind. June 24, 2005).

The Defendants' substantial expenditures in advertising and promoting their YOURCAREEVERYWHERE services also belie the suggestion that the Defendants intended to trade off of Epic's goodwill. The Defendants have spent millions of dollars promoting and building awareness of YOURCAREEVERYWHERE. DFF 129, 130. If the Defendants really intended to shortcut the process of building their own trademark and brand by trading off of the goodwill associated with Epic's mark, one would not expect to see such substantial expenditures. Furthermore, because the CARE EVERYWHERE mark is weak, the undisputed evidence fails to support the inference that the Defendants intended to palm off their consumer-facing website as related in any way to Epic or its CARE EVERYWHERE interoperability software. This factor weighs heavily against a finding of likelihood of confusion.

### 5. *The Marks Are Used in Different Areas and Manners.*

The area and manner of concurrent use also weigh against a likelihood of confusion. For this factor, courts consider "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *Sorenson*, 792 F.3d at 730 (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001)). Thus, courts ask "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Id.* Importantly, where there is "minimal, if any, overlap in [the parties'] customers," likelihood of confusion is unlikely. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330 (7th Cir. 1993); *Packman*, 267 F.3d at 646 (citing *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 717–18 (Fed. Cir. 1992)). Here, Epic and MEDHOST do not "use similar marketing procedures," do not "target the same general audience," and have "minimal, if any, overlap in customers." *Sorenson*, 792 F.3d at 730; *Smith Fiberglass*, 7 F.3d at 1330. Confusion is therefore unlikely.

Epic markets its products, including CARE EVERYWHERE, only to healthcare providers and organizations through attendance at trade shows, hosting its own user conferences, and participation in industry events. DFF 66, 64, 95. Epic largely relies on word-of-mouth for sales of its products. DFF 66. Defendants, on the other hand, market the YOURCAREEVERYWHERE website directly to the public through online advertisements,[5] public relations, social media and the like. DFF 134. There is simply no similarity in the products, the target consumers of those products, the manner in which the products are marketed and advertised, or the way in which the products are sold.

As an initial matter, Epic and YCU do not directly compete with the CARE EVERYWHERE software and YOURCAREEVERYWHERE services. As explained above, the YOURCAREEVERYWHERE mark is primarily used to identify a health and wellness website and ancillary services (DFF 151, 153), while the CARE EVERYWHERE mark is used to identify the component of Epic's EHR software that provides interoperability functionality for exchanging patient medical records. DFF 27. Competition also does not exist because Epic does not offer *any* product that competes with YOURCAREEVERYWHERE. DFF 185. Epic does not offer any health or wellness websites, (DFF 49) and Epic does not create or sell any consumer-oriented health and wellness content. DFF 49, 50. Indeed, Epic views WebMD—a company that offers content similar to YOURCAREEVEYWHERE—as a complementary vendor, not a competitor. DFF 187. Defendants, on the other hand, consider WebMD YOURCAREEVERYWHERE's primary competitor. DFF 186. ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] ████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

      ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████     YOURCAREEVERYWHERE, in

contrast, is specifically targeted to not only patients but any member of the general public. DFF

151. Anyone with an internet connection can visit the YOURCAREEVERYWHERE website

and access its health and wellness content. DFF 151.

      The difference in target market also explains why the parties' products and services travel

in very different market channels. ████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████     In contrast, YCU does not solely rely on its healthcare customers to motivate

consumers to visit the YOURCAREEVERYWHERE website. DFF 134. Instead, YCU

advertises directly to ordinary consumers—patients and non-patients alike. DFF 134. Epic and

YCU thus use and promote their marks in fundamentally different ways, and consumers are

unlikely to be confused when they encounter the YOURCAREEVERYWHERE mark.

      Finally, even if one evaluates possible similarities between Epic's and MEDHOST's

EHR   products   (as   opposed   to   only   the   CARE   EVERYWHERE   and

YOURCAREEVERYWHERE products and services), the areas and manners of use still weigh against any finding of likelihood of confusion. Epic and MEDHOST do not compete for the same types of customers. *Compare* DFF 70-79 to DFF 164. █████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████

MEDHOST, on the other hand, describes its target customer as community hospitals. DFF 164. A community hospital usually has no more than 200 beds. DFF 164. Actual market data confirms that, in practice, Epic and MEDHOST have minimal overlap in customers. As of March 2016, Epic had 38% of the market share for EHR systems in all physician practices, sub-acute care facilities (e.g. rehab and long-term care), and hospitals of all bed sizes. DFF 190. In comparison, MEDHOST's market share was approximately 1%. DFF 190.When comparing EHR systems in use by hospitals having more than 200 beds, Epic leads all vendors with 558 hospitals comprising 32% of the market. DFF 191. MEDHOST, on the other hand, serves 17 hospitals which make up approximately 1% of the market. DFF 191. The Defendants also sell their products directly to customers; they do not have a program similar to Epic's Community Connect program that allows the Defendants' customers to act as resellers of their products.

[6] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

DFF 161. Likewise, MEDHOST does not sell an ambulatory product to physicians that is equivalent to Epic's EpicCare Ambulatory product. DFF 117. Because the parties serve such vastly different types of customers, the minimal overlap in customers weighs against likelihood of confusion. *Packman*, 267 F.3d at 646.

Unsurprisingly, neither Epic's CEO nor its expert are aware of any instances in which Epic competed directly with MEDHOST on an opportunity to sell EHR software to a prospective customer. DFF 182, 183; *see Smith Fiberglass*, 7 F.3d at 1320 (affirming finding that direct competition did not exist based on testimony from plaintiff's witness that "he had no knowledge of direct competition" between the parties). In reality, Epic directly competes with just two other vendors—Cerner and Allscripts—on over 90% of its business opportunities. DFF 179, 180. MEDHOST is not one of those competitors, and Epic employees do not identify MEDHOST as having any interoperability product that competes with CARE EVERYWHERE. DFF 185. As Epic also does not provide general health and wellness content on a consumer-oriented website (DFF 49), competition between the relevant products and services, and largely between the parties at all, is nonexistent.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ Therefore, the overlap between MEDHOST customers and Connect sites also fails to establish likelihood of confusion. Simply put, there is little, if any, similarity in the areas

and manner of use of the Parties' respective marks, and this factor weighs against a finding of likelihood of confusion.

> ### 6.    As Used, the YOURCAREEVERYWHERE and CARE EVERYWHERE Marks Are Dissimilar.

When actually encountered in the marketplace, Epic and YCU use their marks in dissimilar ways, which weighs against a likelihood of confusion. In particular, YOURCAREEVERYWHERE has a different prefix, is part of a family of YOURCARE marks (DFF 142), and appears different from CARE EVERYWHERE on the products and services for which they are used.

"In determining whether two marks are similar, the comparison is made 'in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side.'" *Packman*, 267 F.2d at 643 (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)). Thus, although the court must "look[] at the marks as a whole," *Henri's*, 717 F.2d at 355, "[i]f one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements," *Sullivan*, 385 F.3d at 777 (quoting *Henri's*, 717 F.2d at 356). Furthermore, "[d]ifferent packaging, coloring, and labeling can be significant factors in determining [that] there is [no] likelihood of confusion." *Packman*, 267 F.2d at 644; *see also Sullivan*, 385 F.3d at 778.

As a threshold matter, the prefix of YOURCAREEVERYWHERE distinguishes it from CARE EVERYWHERE. YCU developed the YOURCAREEVERYWHERE mark as part of a family of YOURCARE-formative marks. DFF 142, 123, 131. When Defendants advertise the YOURCAREEVERYWHERE mark, other marks in the family, such as YOURCAREUNIVERSE, ordinarily accompany the mark. DFF 128. Likewise, the "MEDHOST" mark also routinely accompanies the YOURCAREEVERYWHERE mark when it

is actually used in commerce. DFF 128. As a result, a consumer would associate YOURCAREEVERYWHERE with YOURCAREUNIVERSE, a family of YOURCARE products and services, and/or with MEDHOST. Thus, the YOURCARE portion of the mark should be accorded greater weight because it is the most noticeable feature of the mark. *Sullivan*, 385 F.3d at 777. Because Epic's CARE EVERYWHERE mark lacks any association with YOURCARE or MEDHOST, a consumer is not likely to be confused into believing that the YOURCAREEVERYWHERE and CARE EVERYWHERE marks indicate the same source.

The marks also appear very different when consumers encounter them on the CARE EVERYWHERE software and YOURCAREEVERYWHERE services. The CARE EVERYWHERE software can only be accessed through some other, independently branded Epic product, such as MyChart. DFF 33-37, 39, 48. When the CARE EVERYWHERE mark appears to patients accessing CARE EVERYWHERE through MyChart, the mark ordinarily appears with a stylized CARE EVERYWHERE logo containing the word "Epic":



DFF 112, 113. In other words, when Epic's CARE EVERYWHERE software is used, the mark always appears alongside the EPIC mark and/or other marks identifying other Epic products. DFF 33-37, 39, 48. "[T]he prominent display of a well-known trademark . . . along with an allegedly infringing mark is a strong indication that there is no likelihood of confusion." *Sorensen*, 792 F.3d at 727; *see also id.* at 731 ("[T]he existence of a well-known mark . . . mean[s] that consumers searching for the plaintiff's good or service [are] likely to take more care to ensure that they chose correctly.").

Like Epic's CARE EVERYWHERE mark, Defendants' YOURCAREEVERYWHERE mark ordinarily appears in commerce alongside the YOURCAREUNIVERSE, MEDHOST, and/or other YOURCARE marks. DFF 128. When patients access the yourcareeverywhere.com website, the YOURCAREEVERYWHERE mark appears in the header with its own stylized logo:



DFF 144. Comparing these actual uses of the marks, a consumer is not likely to be confused. The dominant portion of the CARE EVERYWHERE logo is a large, red "C" with a gold ring around it such that the "C" and gold ring form the letter "e." DFF 113. The dominant portion of the YOURCAREEVERYWHERE logo is three blue clipboards, with each clipboard having one of a red stethoscope, a red electrocardiograph line, and a red heart suspended above an outstretched hand. DFF 144. The parties therefore use the marks with different coloring and visual elements. Because the marks have different appearances, and are frequently associated with their "parent" and/or "sister" marks when used in commerce, this factor also weighs against a likelihood of confusion.

### 7.    *Consumers Who Know of Care Everywhere Are Knowledgeable and Likely to Exercise Significant Care.*

The knowledge of consumers who are familiar with the CARE EVERYWHERE mark also weighs against a likelihood of confusion. "The consumers relevant to [the] likelihood of confusion inquiry are not those who go to the store seeking to buy [the defendant]'s products. Rather [the Court is] interested in those customers who seek to buy [the plaintiff]'s products (or are undecided about what to buy), and are potentially mislead into buying a [defendant]

30

product." *Sorenson*, 792 F.3d at 730–31. When these relevant consumers "are sophisticated, deliberative buyers," *Rust Env't*, 131 F.3d at 1217, or when the price of the "trademarked product is high, the courts assume that purchasers are likely to be more discriminating than they might otherwise be," *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985) (internal quotation marks and citation omitted); *see also Breuer Elec. Mfg. Co. v. Hoover Co.*, 1998 WL 427595, at *14 (N.D. Ill. July 23, 1998) (finding less chance of a likelihood of confusion when consumers are "more likely to be knowledgeable, cautious buyers."). Thus, even where two parties "share [a common] word" and "provide very similar services, . . . confusion is less likely to occur with sophisticated business customers that typically purchase Plaintiff's products and services." *Box Acquisitions, LLC v. Box Packaging Prods., LLC*, 32 F. Supp. 3d 927, 939 (N.D. Ill. 2014). Here, the undisputed evidence weighs against likelihood of confusion because the relevant consumers are knowledgeable and sophisticated buyers and the products are expensive.

First, confusion is unlikely among the primary target consumers of Defendants' YOURCAREEVERYWHERE website (i.e., the public), in part, because only a small group of patients are knowledgeable about CARE EVERYWHERE and would ever actively seek Epic's products. *See* DFF 38, 39, 42-44, 151. Patients are ordinarily aware of CARE EVERYWHERE only after they associate with an Epic facility and either provide consent to use CARE EVERYWHERE or access the facility's MyChart patient portal. DFF 38-48. Oftentimes, however, patients are never even made aware that Epic is the source of the CARE EVERYWHERE product, as opposed to their healthcare provider. DFF 98-110. Assuming that those patients are then exposed to the CARE EVERYWHERE mark, those patients understand, at a minimum, that the product gets their records from one place to another. DFF 197. In other words, patients aware of CARE EVERYWHERE have a basic understanding that it is

interoperability software. DFF 197, 102-110. Armed with this understanding, it is inconceivable that a patient looking for interoperability software associated with his or her healthcare provider would be misled into using YOURCAREEVERYWHERE instead. No reasonable consumer would visit yourcareeverywhere.com and mistake the publicly available health and wellness content website (DFF 151) as Epic's CARE EVERYWHERE software.

Second, confusion is unlikely because CARE EVERYWHERE is associated with Epic and healthcare providers are ordinarily aware of Epic and the CARE EVERYWHERE product when they begin the process to obtain Epic's EHR software. DFF 193, 194. Oftentimes, Epic's customers do not require education on the functionality of the CARE EVERYWHERE software because they are already informed that it is an interoperability software tool. DFF 194. Rather, Epic's prospective customers want to know what other providers use the CARE EVERYWHERE software and are capable of engaging in the transfer of patient records. DFF 194.

Furthermore, the significant care exercised by these relevant customers also weighs heavily against likelihood of confusion. *See, e.g.*, DFF 195. Executives and professionals within healthcare provider organizations are extremely sophisticated and likely to exercise significant care when selecting costly and complex EHR software. DFF 82-85, 195. In fact, it is difficult to conceive of a more knowledgeable and sophisticated consumer base than healthcare executives and clinicians.

Epic has largely conceded, as it must, that its direct customers are sophisticated, knowledgeable, and careful. DFF 82-85, 195. In light of the significant cost of implementing EpicCare and the involvement of C-suite executives in the purchasing process, these customers

satisfy the hallmarks of "sophisticated, deliberative buyers." *Rust Env't*, 131 F.3d at 1217. Confusion is thus very unlikely in these sophisticated businesses.



Moreover, customers do not approach lightly the decision to purchase Epic's EHR software. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ "None of the relevant [products] is the sort of low-priced item to which a consumer might devote little careful thought, such as a broom or a story book that might be purchased on impulse to distract a fussy child." *See AM Gen.*, 311 F.3d at 827–28 (citations omitted).

The knowledge and sophistication of the relevant consumers, in addition to the substantial expense associated with the purchase of the products, strongly weigh against any likelihood of confusion between the parties' respective marks.

Aside from both parties' use of the words "care" and "everywhere" within their respective marks, not a single factor relevant to the likelihood of confusion analysis supports

---
[7] ████████████████████████████████████████████████

Epic's claims. There is no genuine dispute as to the material facts, and this case is ripe for judgment as a matter of law. The Defendants are entitled to an award of summary judgment in their favor on all of Epic's claims.

### B.      Epic Has Failed to Establish that this Case Is "Exceptional."

Even if the court does not grant summary judgment as to Epic's claims and if Epic ultimately prevails at trial, this Court should still grant summary judgment as to Epic's claim that this is an "exceptional" case ripe for an award of attorneys' fees or other enhanced relief.  This case clearly does not fall within the circumstance of an exceptional case that would merit such an award.

Under the Lanham Act, a court may award reasonable attorney fees and other enhanced damages to the prevailing party only "in exceptional cases." 15 U.S.C. § 1117(a). In the Seventh Circuit, cases have been deemed exceptional only if the defendant "had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent." *Nightingale Home Healthcare, Inc. v. Andoyne Therapy, LLC*, 626 F.3d 958, 963–64 (7th Cir. 2010). Where the defendant has "a claim or defense that a rational litigant would pursue," the case is not exceptional. *Id.* at 965. A court may therefore grant summary judgment against a claim for attorneys' fees and/or enhanced relief where the "plaintiff has failed to put forth any evidence demonstrating that defendant persisted in the trademark infringement in order to impose costs on plaintiff." *Brainstorm Interactive, Inv. v. School Specialty, Inc.*, 2014 WL 6893881, at *18 (W.D. Wis. 2014). "Merely negligent [conduct] certainly does not support a finding of 'exceptional case' warranting an award of attorneys' fees." *Id.*

As demonstrated by Defendants' motion for summary judgment, they have numerous meritorious defenses to this action. Epic has no evidence to establish that the Defendants "had no

defense yet persisted in the trademark infringement . . . in order to impose costs on" Epic. *Nightingale*, 626 F.3d at 963–64. On the contrary, the undisputed evidence establishes that the Defendants did not intend to infringe Epic's mark, that the Defendants have defended the case on the reasonable basis that there is no likelihood of confusion, and that Epic—not the Defendants—escalated the costs and burdens of this dispute.

The undisputed evidence fails to establish that the Defendants have ever intended to trade on Epic's goodwill. *See, e.g.*, DFF 135. An intent to palm off cannot be established from the mere fact that the Defendants were aware of CARE EVERYWHERE when they adopted YOURCAREEVERYWHERE or that the Defendants continued to use the mark after Epic contacted them. *Sorenson*, 792 F.3d at 731; *Sands, Taylor*, 978 F.2d at 962. Moreover, the Defendants' conduct, investing millions in advertising and promoting the YOURCAREEVERYWHERE brand (DFF 130), is entirely inconsistent with Epic's theory that the Defendants sought to benefit from goodwill associated with Epic's CARE EVERYWHERE mark. This substantial investment in YCU's mark provides just one reason why the Defendants have reasonably persisted in this litigation. *Cf. Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 590 (7th Cir. 2015) (affirming finding that case was not exceptional where there was no "direct evidence that [the Defendants] brought suit solely to obtain an economic benefit for [themselves] unrelated to winning the suit").

This case is also not exceptional because the Defendants have, at the bare minimum, a colorable defense that there is no likelihood of confusion. "[A] colorable claim of [or defense to] trademark infringement" is more than sufficient to conclude that a case is not exceptional. *Specht v. Google, Inc.*, 805 F. Supp. 2d 551, 558 (N.D. Ill. 2011). This applies even if a party has "significant deficiencies"—not present here—in some of its positions. Here, Epic does not have

a single instance of actual confusion and has not undertaken any effort to locate such confusion. DFF 213-217. That lack of evidence by itself is compelling evidence that this is not an "exceptional" case. *Nike*, 6 F.3d at 1231 ("[I]t is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion."). Numerous other factors weigh against likelihood of confusion as well, including that the CARE EVERYWHERE mark is weak due to its common, descriptive use in the healthcare industry; that the parties use their respective marks on fundamentally different products; and that the parties do not compete for the same types of customers. In addition, an expert third party—the trademark examiner—concluded that YCU's mark did not conflict with any senior marks, including Epic's CARE EVERYWHERE Mark. DFF 199. All of this evidence collectively refutes that the Defendants have proceeded in this litigation for an improper purpose.

Indeed, to the extent that any party in this case had "the motive . . . to impose litigation costs on a new entrant in the market," it would be Epic, not the Defendants. *Burford*, 786 F.3d at 589. Almost a year and a half ago, Epic filed an opposition to YCU's application to register the YOURCAREEVERYWHERE mark. DFF 202. The parties progressed through six months of discovery and important deadlines were imminent in that proceeding when Epic filed its Complaint in this Court. DFF 203. The Defendants initially moved to stay this litigation in the hopes that the parties could continue with a more efficient, less costly resolution. DFF 206, 207. Had Epic agreed with that approach, the parties would have completed their trial nearly three months ago. DFF 206. Instead, the parties' dispute continues. The Defendants cannot be faulted for their reasonable positions in this Court, and they are due an award of summary judgment in their favor finding that this case is not "exceptional" 15 U.S.C. § 1117(a).

## V.     <u>CONCLUSION</u>

For all of the reasons discussed herein, there is no genuine dispute that there is no likelihood of confusion in the marketplace between Epic's CARE EVERYWHERE mark and Defendants' YOURCAREEVERYWHERE mark. Defendants are therefore entitled to summary judgment in their favor on all of Epic's claims. Even if the Court does not grant summary judgment in Defendants' favor on Epic's claims, there is no genuine dispute that this is not an "exceptional" case as contemplated by 15 U.S.C. § 1117(a), and Defendants are alternatively entitled to an award of summary judgment that this is not an "exceptional" case.

Dated: December 2, 2016                  Respectfully submitted,

By:  */s/ Jennifer L. Gregor*
   Kimberly B. Martin (*pro hac vice*)
   Angela Holt *(pro hac vice)*
   David W. Holt *(pro hac vice)*
   Jake Gipson *(pro hac vice*)
   BRADLEY ARANT BOULT CUMMINGS LLP
   200 Clinton Avenue West, Suite 900
   Huntsville, AL 35801-4900
   Telephone: (256) 517-5100
   kmartin@babc.com; aholt@babc.com;
   dholt@babc.com; jgipson@babc.com


   Kendall W. Harrison
   Jennifer L. Gregor
   GODFREY & KAHN, S.C.
   One East Main Street, Suite 500
   Madison, WI 53703
   Telephone: (608) 257-3911
   kharrison@gklaw.com; jgregor@gklaw.com

   *Attorneys for Defendants YourCareUniverse, Inc.,*
   *MEDHOST of Tennessee, Inc., and MEDHOST*
   *Direct, Inc.*

16484790.1